## THOMPSON v. CHATHAM WATERWORKS CO.

(Supreme Court, Appellate Division, Third Department. May 2, 1900.)

1. SALE—CONTRACT—FAILURE TO FULFILL.

Where plaintiff sold certain windmills and pumps to defendant under an agreement that they would supply defendant's reservoir, and the pumps were not of sufficient capacity to do so, plaintiff cannot recover the purchase price.

2. SAME—DEFENDANT'S FAULT—EVIDENCE.

Plaintiff's contract for the sale of certain windmills and pumps to defendant provided that defendant should furnish a suction pipe to be used in connection therewith. In a suit for the purchase price, plaintiff claimed that a failure of his pumps to work properly was due to defects in defendant's suction pipe. The only evidence of a defect was the admission of defendant's foreman that a pipe connecting the suction pipe with a part of plaintiff's pumps was cracked (which was controverted), and the testimony of plaintiff's servant that he saw a streak along the pipe, which he did not examine. Plaintiff's other pumps, connected with the suction pipe, should have worked properly notwithstanding the defective pipe, but did not; and, in a letter to defendant, plaintiff failed to complain of the defective pipe. *Held,* that a finding that defendant's defective suction pipe prevented plaintiff's pumps from working properly was not sustained by the evidence.

Appeal from trial term, Columbia county.

Action by John R. Thompson against the Chatham Waterworks Company to recover the price of certain windmills and pumps. From a judgment in favor of plaintiff, and from an order denying defendant's motion for a new trial, it appeals. Reversed.

The plaintiff entered into a contract with defendant to furnish and erect near to the defendant's wells four windmills, towers, and pumps, to supply defendant's reservoir for one year from the date of erection; and in the contract it was stipulated that if, during that time, they failed to supply water sufficient to supply the demands upon the defendant for 11 months, he would remove them, and make no charge; if they did supply to the defendant such water for 11 months, the defendant was to pay $1,290 therefor. The plaintiff proceeded to perform his contract, and in July of that year gave notice to the defendant that the mills and pumps were in readiness for use. The defendant was, by the contract, to furnish certain connections and a certain suction pipe. By consent, that was not furnished until August of that year. The windmills failed to work, and, after several attempts to make them work, in April, 1894, an expert came, and discovered that the windmills were defective, in not having certain friction rings, so called, which were then supplied. Thereafter various attempts were made to work the pumps and mills which proved abortive, and they have never been able to work continuously. In 1896 the attempts were abandoned, and in July, 1897, this action was commenced. Further facts appear in the opinion.

Argued before PARKER, P. J., and HERRICK, MERWIN, SMITH, and KELLOGG, JJ.

J. Rider Cady, for appellant.
William H. Wood, for respondent.

SMITH, J. The plaintiff has recovered in this action upon the theory that he has furnished the mills and pumps contracted for, and that the failure of the same to perform their work is through the fault of the defendant, in not providing a proper suction pipe, which, by the terms of the contract, it was required to supply. Upon this appeal the defendant makes two contentions: First, that the pumps furnished were confessedly incapable of supplying the water contracted for, however perfectly they may have worked; secondly, that the failure of the pumps and mills to work was through defective construction, and not by reason of a defect in the suction pipe, as claimed by the plaintiff.

As to the defendant's first contention, it appears that the defendant was supplying water to the Boston & Albany Railroad Company, and for certain purposes to the village of Chatham; that in the year 1892 88,000,000 gallons were supplied upon demand, in the year 1893 80,000,000, and in the year 1894 an equal number. By the plaintiff's own testimony, the capacity of the pumps which he supplied was about 150,000 gallons a day. He puts it at 115,000 gallons a day. Taking his highest figure, the capacity of the pumps furnished was wholly inadequate to meet the requirements of the contract. This is impliedly conceded by the plaintiff himself. He is asked:

"Q. Didn't you find out before entering into the contract what you were undertaking to do? A. To a certain extent, I did. I knew I could put in pumps, if they were not large enough, that were two and a half times the

capacity. I was willing to do that, if they were inadequate. I wanted to get as small pumps as possible to do the work, and I was willing to increase them if necessary."

There is no evidence anywhere in the case that the pumps furnished by the plaintiff had any greater capacity. One of the foremen of the defendant was asked this question:

"Q. If the windmill pumps would have pumped one hundred thousand gallons a day, it would have been enough for the village? A. Well, I should say so. It slips my mind."

We are satisfied that it was not the intention of the witness to state that that would have satisfied all the demands made upon the defendant; for he afterwards swears that the demands made upon the defendant were as reported to the company, which report shows a demand of over 80,000,000 gallons a year. The plaintiff has sued to recover the agreed purchase price of four certain windmills, towers, and pumps which he was to furnish under the contract. He has recovered the full contract price therefor, without one word of proof that his windmills and pumps had the required capacity, and with the evidence in the case practically conceded that they had not. The authorities authorize a recovery for the contract price when the seller has the article agreed to be sold ready for the purchaser, which the purchaser refuses to take. This rule of law is based upon the theory that upon payment of the judgment the purchaser can obtain his property, which is held by the seller for him. In the case at bar there is no evidence whatever that the plaintiff has the pumps of capacity required to fulfill the contract, and to require this defendant to pay this judgment would require him to pay for property which he has never had, which has never been offered to him, and which, perchance, he can never obtain. It would seem difficult to justify this recovery upon any known principle of law.

Again, the defendant's second contention presents a question fatal to this recovery. At the time of the making of this contract, and from that time down to the commencement of this action, the defendant was supplied by pumps worked by engine power. There was a suction pipe extending north and south several feet, from which ran branch pipes into the various wells situated on either side of this suction pipe. These windmills, towers, and pumps were located, two of them north and two of them south of this suction pipe, and they were connected with the wells by extending the suction pipe northerly and southerly. Where this pipe was extended there were two valves, which, when shut, in effect shut off the suction pipe leading to the windmills. When the windmills were working, these valves were open, so that the water could be drawn into the pump operated by the windmill. If the windmills were in proper condition, no air could come into the suction pipes, and the wells could be operated by the steam engine with the valves open, and the necessary vacuum created for sucking the water into the pump thereby operated. If the wells were not in proper condition, air came into the suction pipe, and these valves were required to be closed in order to secure the proper vacuum for the pumps oper-

ated by the steam engine. I do not understand that any leakage was caused from any valve, except as it came from the windmill pumps. In 1896 the valve upon the south part of the extension began to leak air when closed, and the piece of the suction pipe which contained this valve was then taken out, and the suction pipe at its south end was plugged. There is some evidence to the effect that this piece of pipe, which contained the valve at the south end, when it was taken out was seen to be cracked, which, if true, would account for the defective working of the windmills and pumps at the south. There is no other evidence of any defect in the suction pipe furnished by the defendant. I have carefully examined the evidence in this case, and am unable to find any sufficient evidence from which the jury could have found that such a crack existed. One witness assumes to swear to certain admissions of the defendant's foreman. These are contradicted by the defendant's foreman, and, if made, are not legal evidence of the fact that that pipe was cracked. It is not a part of the agency of a foreman to stand around making admissions against his principal, and the evidence would probably have been excluded by the trial court, had objection been made. The only other evidence of this crack was the evidence of plaintiff's servant Flynn. He was there after the pipe had been taken out, and upon the trial was thus examined:

"Q. Did you afterwards see this pipe—the suction pipe—that was taken out? A. Yes, sir. Q. Did you examine it? A. No, sir. Q. You did not look it over so you are able to state of your own knowledge that there was a crack in it? A. No, sir; I saw a streak along in it. Q. Where was it? A. On the side of the pipe, a little ways from the threaded end."

It is true that the witness afterwards speaks of it as a crack, and of sufficient size to have made this trouble; but, in the light of his evidence that he did not examine it sufficiently to say that there was a crack in it, the evidence would seem too slight upon which to base a verdict as for a defective pipe. But this evidence is contradicted by all of defendant's witnesses who saw that pipe, and the plaintiff himself saw the pipe after it had been taken out, and discovered no defect whatever in it. The plaintiff claims to have at all times contended that his pumps were in proper condition, and the defect must have been in the suction pipe. The defendant's witnesses deny that that claim was ever made. It is not claimed that the plaintiff at any time asked for an examination of those pipes, nor for a test thereof. After this pipe was removed, it was seen by the plaintiff, and inspected by his man Flynn. It is claimed by Flynn that the defendant's foreman made this admission as to the crack. On June 19, 1896, the defendant wrote to the plaintiff, and told him they had decided to allow him another chance to test the mills; that he was to have them ready by the 1st of July, and they were to be tested under his direction, if he chose. In reply to that, upon the 29th of June, after plaintiff and his foreman had both seen this piece of pipe, plaintiff writes:

"I intended to send men to Chatham to-day and put the windmills and pumps in order, but, as my windmill man has been sick, I cannot do so, and a little more delay will be necessary."

There is no claim in that letter of any fault of the defendant in failing to supply proper suction pipes, and, except for the plaintiff's own testimony, no suggestion of that kind was ever made until after the action was commenced. The failure to make this claim in this letter after the claimed discovery strongly discredits the existence of such fact. The defendant's testimony upon this is fortified, too, by the fact that no claim is now made that the suction pipe was defective, except the pipe running to the pumps at the south. It appears in evidence that the valve at the north of the suction pipe stood the test of 80,000,000 gallons a year, as pumped by the steam engine. Had defendant suggested to any one at that time that any crack in this suction pipe towards the pumps at the south end was causing trouble, that valve could have been closed, and the pumps at the north end tested. After that piece of pipe was removed, and the suction pipe was plugged at the south end, the mills and pumps at the north end should have worked, if properly constructed. From the evidence, it appears that none of the mills and pumps at any time worked satisfactorily. The finding of the jury that it was the defendant's fault which prevented the proper working of these pumps has no sufficient foundation in the evidence.

Judgment and order reversed on the law and the facts, and new trial ordered, with costs to the appellant to abide the event. All concur; MERWIN, J., on ground first stated.